Filed 8/9/18 (unmodified opn. attached; second modification)

**TO BE PUBLISHED IN THE OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| B.B., a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants. | B264946<br><br>Los Angeles County<br>Super. Ct. Nos. TC027341,<br>TC027438, BC505918<br><br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |
| T.E., a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants. | |
| D.B., a Minor, etc., et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed herein on July 10, 2018, be modified as follows:

1.  On page 3, the third sentence of the first full paragraph is deleted, and the following is inserted in its place:

"Accordingly, we will direct the trial court to vacate the judgment and enter a separate judgment against Deputy Beserra and the County and a separate judgment against Deputy Aviles and the County, holding them liable for the noneconomic damages award in an amount proportionate to the jury's comparative fault determinations."

2.  On page 3, the first sentence of the last paragraph is deleted, and the following is inserted in its place:

"Plaintiffs B.B., B.B., and T.E. ("Cross-Appellants") filed a cross-appeal from the trial court's order granting Defendants summary adjudication on Cross-Appellants' claims for civil rights violations under Civil Code section 52.1."

3.  The sentence beginning at the bottom of page 3, and continuing to the top of page 4, is deleted, and the following is inserted in its place:

"We conclude the summary adjudication order must be reversed as to the Cross-Appellants, because Cross-Appellants presented sufficient evidence to raise a triable issue as to whether the deputies acted intentionally in interfering with Burley's right to be free from unreasonable seizure."

4.  On page 42, the first full sentence at the top of the page is revised as follows: "and the County" is added after "Aviles" (the beginning of the sentence shall read, "We agree, and will therefore direct the trial court to enter a separate judgment against Aviles and the County, . . . .").

5.  On page 50, the last sentence before section "5." is deleted, and the following is inserted in its place:

"Because Deputy Aviles's liability is governed by section 1431.2, the judgment must be vacated and separate judgments must be rendered against (i) Deputy Beserra and the County and (ii) Deputy Aviles and the County, in direct proportion to each individual defendant's percentage of fault, as found in the jury's comparative fault determinations."

6.  On page 50, the first sentence of the first paragraph of section "5." is revised as follows: "B.B., B.B., and T.E." is added after "Plaintiffs" and before "cross-appealed" (the beginning of the sentence shall read, "Plaintiffs B.B., B.B., and T.E. cross-appealed from the trial court's order . . . .").

2

7. The sentence beginning at the bottom of page 50, and continuing to the top of page 51, is revised as follows: the word "Plaintiffs' " at the end of the sentence is replaced with "Cross-Appellants' " (the end of the sentence shall read, ". . . we conclude the court erred in granting summary adjudication against Cross-Appellants' Bane Act claims.").

8. On page 51, sub-heading "a." is deleted, and the following is inserted in its place: "a. *Defendants were not entitled to summary adjudication on Cross-Appellants' Bane Act claims*"

9. On page 52, the first sentence of the first full paragraph is deleted, and the following is inserted in its place:
"In their cross-appeal, Cross-Appellants argue the trial court fundamentally misread *Shoyoye*."

10. On page 52, the third sentence of the first full paragraph is deleted, and the following is inserted in its place:
"But where the civil rights violation is *intentional*, Cross-Appellants argue the statutory requirements of the Bane Act are met, even if coercion is inherent in the underlying violation."

11. On page 52, the last sentence of the first full paragraph is revised as follows: the word "Plaintiffs" at the beginning of the sentence is replaced with "Cross-Appellants" (the beginning of the sentence shall read, "We agree with Cross-Appellants . . . .").

12. The sentence beginning at the bottom of page 59, and continuing to the top of page 60, is revised as follows: the word "Plaintiffs" at the beginning of the sentence is replaced with "Cross-Appellants" (the beginning of the sentence shall read, "Here, Cross-Appellants presented . . . .").

13. The last full sentence in the body of page 60 is revised as follows: the word "Plaintiffs' " in mid-sentence is replaced with "Cross-Appellants' " (the middle of the sentence shall read, ". . . Cross-Appellants' evidence suggested Defendants . . . .").

14. On page 61, the last full sentence before sub-section "b." is revised as follows: the word "Plaintiffs" at the beginning of the sentence is replaced with "Cross-Appellants" and the word "Plaintiffs' " at the end of the sentence is replaced with "Cross-Appellants' " (those portions of the sentence shall read, "Because Cross-Appellants presented sufficient evidence . . . summary adjudication of Cross-Appellants' Bane Act claims.").

15.     On page 65, the last sentence of the first paragraph of the "DISPOSITION" section is deleted, and the following is inserted in its place: "On remand, the trial court is directed to vacate the judgment and enter a separate judgment against Deputy Aviles and the County and a separate judgment against Deputy Beserra and the County allocating noneconomic damages to each defendant and the County in direct proportion to each individual defendant's percentage of fault, as found in the jury's comparative fault determinations."

16.     On page 65, the first sentence of the second paragraph of the "DISPOSITION" section is deleted, and the following is inserted in its place: "The order granting summary adjudication to Defendants on Cross-Appellants' Civil Code section 52.1 claims is reversed, and the matter is remanded to the trial court for further proceedings consistent with the principles expressed in this opinion."

There is no change in the judgment.

_____

EDMON, P. J.                    EGERTON, J.                    DHANIDINA, J.*

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

4

Filed 7/12/18 (unmodified opn. attached)

**TO BE PUBLISHED IN THE OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| B.B., a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants. | B264946<br><br>Los Angeles County<br>Super. Ct. Nos. TC027341,<br>TC027438, BC505918<br><br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |
| T.E., a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed herein on July 10, 2018, be modified as follows: The caption is deleted and the below caption is inserted in its place.

B.B., a Minor, etc., et al.,

    Plaintiffs and Appellants,

      v.

COUNTY OF LOS ANGELES et al.,

    Defendants and Appellants.

T.E., a Minor, etc., et al.,

    Plaintiffs and Appellants,

      v.

COUNTY OF LOS ANGELES et al.,

    Defendants and Appellants.

D.B., a Minor, etc., et al.,

    Plaintiffs and Respondents,

      v.

COUNTY OF LOS ANGELES et al.,

    Defendants and Appellants.

There is no change in the judgment.

_____

EGERTON, J.           EDMON, P. J.           DHANIDINA, J.*

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| B.B., a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants. | B264946<br><br>Los Angeles County<br>Super. Ct. Nos.<br>TC027341, TC027438,<br>BC505918 |
| D.B., etc., et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants. | |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Ross M. Klein, Judge. Affirmed in part, reversed in part with directions.

---

[*]    Under California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 1 through 3 and subpart b of part 5 of the Discussion.

Pine Tillett Pine, Norman Pine, Stacy Freeman, and Scott Tillett; The Sweeney Firm and John E. Sweeney; Orange Law Offices and Olu K. Orange for Plaintiffs and Appellants B.B., a Minor, etc., et al. and T.E., a Minor, etc., et al.

Douglas / Hicks Law and Carl E. Douglas; Antablin & Bruce and Drew Antablin for Plaintiffs and Respondents D.B., etc., et al.

O'Melveny & Myers and Sabrina Heron Strong; Manning & Kass, Ellrod, Ramirez, Trester, Eugene P. Ramirez, Louis W. Pappas, Steven J. Renick, Julie M. Fleming, and Angela M. Powell for Defendants and Appellants.

---

## INTRODUCTION

Darren Burley suffered brain death from lack of oxygen due to a cardiac arrest following a prolonged and violent struggle with several deputies of the Los Angeles County Sheriff's Department, who were called to arrest Burley after he assaulted a woman while under the apparent influence of cocaine, marijuana, and PCP.  In a wrongful death action brought by Burley's estranged wife and five children (Plaintiffs) against the deputies and the County of Los Angeles (collectively, Defendants), a jury found Deputy David Aviles liable for intentional battery by use of excessive force and Deputy Paul Beserra liable for negligence resulting in Burley's death.  The jury attributed 40 percent of the fault to Burley for his own death, and found Deputies Aviles and Beserra each 20 percent at fault, while allocating the remaining 20 percent of fault to the other deputies.  The jury awarded Plaintiffs $8 million in noneconomic damages, and the trial court entered judgment

against Aviles for the full amount of the award based on the jury's finding that he intentionally harmed Burley.

On appeal, Defendants argue (1) the evidence was insufficient to support the jury's causation findings; (2) multiple irregularities and instances of misconduct by Plaintiffs' attorneys combined to deprive Defendants of a fair trial; (3) the trial court improperly instructed the jury on damages and the evidence was insufficient to support the damages award; and (4) the court erred in holding Deputy Aviles liable for the full noneconomic damages award despite the jury's comparative fault allocation. We agree with Defendants that Civil Code section 1431.2 mandates allocation of the noneconomic damages award in proportion to each defendant's comparative fault, notwithstanding the jury's finding of intentional misconduct. Accordingly, we will direct the trial court to vacate the judgment and enter separate judgments for each of Deputies Beserra and Aviles, holding them liable for the noneconomic damages award in an amount proportionate to the jury's comparative fault determinations. We find no reversible error on the other grounds.

Plaintiffs filed a cross-appeal from the trial court's order granting Defendants summary adjudication on Plaintiffs' claims for civil rights violations under Civil Code section 51.2. One plaintiff, T.E., also cross-appeals from the court's order denying her motion for private attorney general fees under Code of Civil Procedure section 1021.5. We conclude the summary adjudication order must be reversed because Plaintiffs presented sufficient evidence to raise a triable issue as to whether the deputies acted intentionally in interfering with Burley's right to

be free from unreasonable seizure.  We find no error in the court's order denying the motion for attorney fees.

### FACTS AND PROCEDURAL BACKGROUND

In this section we give an overview of the facts necessary to put the disputed issues in context.  Additional facts relevant to specific issues are discussed in later sections.  Consistent with our standard of review and the rules of appellate procedure, we state the facts in the light most favorable to the judgment. (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 532, fn. 1.)

On the evening of August 3, 2012, residents of a Compton, California neighborhood heard frantic screams for help and saw a man, later identified as the decedent, Darren Burley, straddling a woman in the street.  Two residents confronted Burley and pushed him off the struggling woman, allowing her to flee. Others called 911 to report the incident.

Deputies David Aviles and Steve Fernandez were the first to arrive at the scene.  As the deputies approached Burley, he stood up, faced them, and, with a blank stare, began making grunting sounds while moving toward them in slow, stiff, exaggerated robotic movements, leading the deputies to conclude that he might be under the influence of PCP.  Aviles ordered Burley to get on his knees facing away from the deputies.  Burley did not respond.

Suddenly, a distraught woman ran into the street, pointed at Burley and yelled, "He tried to kill me!"  Burley's attention turned to the woman, and as he moved to pursue her, Deputy Fernandez "hockey checked" him, causing Burley to hit his head on a parked truck before falling to the ground.

After a struggle, the deputies maneuvered Burley to a prone position, face-down on the concrete. Deputy Aviles then mounted Burley's upper back, while pinning Burley's chest to the ground with the maximum body weight he could apply. As Deputy Fernandez knelt on Burley's upper legs with all of his weight, Aviles pressed his right knee down on the back of Burley's head, near the neck, and his left knee into the center of Burley's back. Burley struggled against the deputies, trying to raise his chest from the ground.

Carl Boyer witnessed the altercation. He testified that one of the deputies held Burley in some type of "head-lock" during most of the struggle. Boyer also saw a deputy hit Burley in the head several times with a flashlight. He said Burley appeared to be gasping for air.

When Deputy Paul Beserra arrived, Burley was face-down and Deputies Aviles and Fernandez were trying to restrain him. Deputies Timothy Lee, Ernest Celaya, and William LeFevre arrived soon after. Beserra attempted to restrain Burley's left arm, while Lee assisted on the right and Celaya held Burley's feet. Celaya and Lee tased Burley multiple times without apparent effect. Eventually the deputies succeeded in handcuffing Burley and hobbling his legs. Beserra estimated three to four-and-a-half minutes passed between his arrival and Burley's handcuffing. Burley was prone on his stomach the whole time, with Aviles on his back.

While the other deputies disengaged, Deputy Beserra stayed with Burley. Approximately two minutes later, Beserra heard Burley's breathing become labored and felt his body go limp. Beserra did not administer C.P.R.

When paramedics arrived, Captain Jason Henderson of the Compton Fire Department found Burley still face-down on his stomach, with Beserra pressing his knee into the small of Burley's back. Burley had no pulse. Paramedics immediately began treating him with C.P.R., a bag-valve mask connected to an oxygen tank, and an endotracheal tube. After five minutes, they restored Burley's pulse and transported him to the hospital.

Burley never regained consciousness and he died 10 days later. The autopsy report listed the cause of death as brain death and swelling from lack of oxygen following a cardiac arrest "due to status post-restraint maneuvers or behavior associated with cocaine, phencyclidine and cannabinoids intake." The manner of death was marked, "could not be determined."

Three sets of plaintiffs filed lawsuits against the County and deputies: (1) Burley's estranged wife, Rhandi T., and their two children; (2) Burley's two children with Shanell S.; and (3) Burley's child with Akira E. The complaints asserted causes of action for battery, negligence, and civil rights violations under Civil Code section 52.1. Defendants moved for summary adjudication of the civil rights claim. The court granted the motion, and the consolidated cases proceeded to trial on the battery and negligence claims against the County and Deputies Aviles, Fernandez, Beserra, Celaya, Lee, and LeFevre.

After a several-weeks-long trial, the jury returned a verdict finding Deputy Aviles liable for battery and Deputy Beserra liable for negligence. The jury attributed 40 percent of the fault to Burley for his own death, and found Aviles 20 percent at fault, Beserra 20 percent at fault, and the remaining deputies 20 percent at fault. After hearing evidence on damages, the jury

6

awarded Plaintiffs $8 million in noneconomic damages for Burley's wrongful death.

Plaintiffs filed a proposed judgment, which Defendants opposed on the ground that it failed to apportion damages for the two liable deputies according to their percentages of fault. After a hearing on apportionment, the court entered judgment against Deputy Beserra and the County for $1.6 million (20 percent of the damages award) and against Deputy Aviles and the County for the full $8 million award.

Following the denial of Defendants' post-trial motions, Plaintiffs moved for attorney fees under Code of Civil Procedure section 1021.5. The court denied the attorney fee motion. This appeal and cross-appeal followed.

## DISCUSSION

### 1. *Substantial Evidence Supports the Jury's Causation Findings*

Defendants contend the evidence was insufficient to establish that Deputy Aviles's unreasonable use of force and Deputy Beserra's negligence were substantial factors in causing Burley's death. They maintain Plaintiffs failed to offer competent expert testimony proving, within a reasonable medical probability, either that asphyxia caused Burley's cardiac arrest, or that the deputies' actions fatally deprived Burley of oxygen. We conclude the evidence was sufficient to support the jury's causation findings.

#### a. *The substantial factor test for causation; legal principles and standard of review*

Whether a defendant's conduct actually caused an injury is a question of fact ordinarily reserved for the jury to decide. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234,

252.) "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968 (*Rutherford*).) While it generally produces the same results as the "but for" rule, our courts have embraced the substantial factor standard as a "clearer rule of causation—one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact." (*Id.* at pp. 968-969; *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052-1053.)

"The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Rutherford, supra,* 16 Cal.4th at p. 978.) Even "a very minor force" that causes harm is considered a cause in fact of the injury. (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79 (*Bockrath*).) Indeed, our Supreme Court has cautioned that "[u]ndue emphasis should not be placed on the term 'substantial,' " observing that "the substantial factor standard, formulated to aid plaintiffs as a *broader rule of causality* than the 'but for' test, has been invoked by defendants whose conduct is clearly a 'but for' cause of plaintiff's injury but is nevertheless urged as an insubstantial contribution to the injury." (*Rutherford,* at p. 969, italics added.) "Misused in this way, the substantial factor test 'undermines the principles of comparative negligence, under which a party is responsible for his or her share of negligence and the harm caused thereby.' " (*Ibid.*; *Bockrath,* at p. 79.)

In cases requiring medical evidence to establish causation, our courts have recognized that "causation must be proven within a reasonable medical probability based upon competent expert

8

testimony.  Mere possibility alone is insufficient to establish a prima facie case."  (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 (*Jones*); *Rutherford, supra,* 16 Cal.4th at pp. 976-977 & fn. 11; *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1416 (*Lineaweaver*); *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1498.)  As the *Jones* court explained in reviewing a judgment of nonsuit against a claim that the defendants' pharmaceutical product caused the plaintiff's cancerous condition, "[a]lthough juries are normally permitted to decide issues of causation without guidance from experts, 'the unknown and mysterious etiology of cancer' is beyond the experience of laymen and can only be explained through expert testimony.  [Citation.]  Such testimony . . . can enable a plaintiff's action to go to the jury only if it establishes a reasonably probable causal connection between an act and a present injury."  (*Jones,* at p. 403.)  "A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action."  (*Ibid.*)

Critically, the standard articulated in *Jones* "do[es] not require a heightened standard for causation."  (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 746 (*Uriell*).)  Rather, as our Supreme Court explained in *Rutherford* with respect to asbestos injury cases, "the reference to 'medical probability' in the standard 'is no more than a recognition that asbestos injury cases (like medical malpractice cases) involve the use of medical evidence.' "  (*Rutherford, supra,* 16 Cal.4th at p. 976, fn. 11; *Lineaweaver, supra,* 31 Cal.App.4th at p. 1416, fn. 2; *Uriell,* at p. 746.)  Thus, regardless of whether expert medical testimony is required to assist the jury, the standard to prove causation is the same:  " ' " '[A plaintiff] is not required to

eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable [persons] may conclude that it is more probable that the event was caused by the defendant than that it was not. . . .' " ' [Only] [i]f the evidence presented on causation leaves the matter ' " 'one of pure speculation or conjecture, or the probabilities are at best evenly balanced, [does] it become[ ] the duty of the court to direct a verdict for the defendant.' " ' " (*Uriell,* at pp. 745-746; *Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1314 (*Espinosa*).)

Where the sufficiency of the evidence is challenged on appeal, we review a jury's causation finding under the familiar substantial evidence standard of review. (*Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 969.) Under that standard, " ' " 'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." ' " (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) We do not reweigh the evidence or evaluate the credibility of witnesses. We must uphold the judgment if it is supported by substantial evidence, even if substantial evidence to the contrary also exists and the trier of fact could have reached a different result if it had believed other evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.) Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 414.)

With these principles in mind, we turn to the evidence admitted at trial to support the jury's causation findings.

b. *The battery verdict against Deputy Aviles*

The jury found Deputy Aviles used unreasonable force against Burley based on evidence showing that Aviles restrained Burley with his right knee on the back of Burley's head and his left knee in the center of Burley's back, while applying as much of his weight (approximately 225-230 pounds including equipment) as he could to Burley's back during their several-minutes-long struggle. Lieutenant Roger Clark, a police procedures expert, opined that Aviles's use of force was unreasonable. He testified Aviles should have recognized Burley was at greater risk of becoming "oxygen-starved," due in part to Burley's evident drug intoxication, and that Aviles should have accounted for Burley's increased need for oxygen during their struggle. Clark testified it would be dangerous and unreasonable to put significant weight on an arrestee's back under such circumstances, emphasizing that deputies are trained to avoid positions that could restrict chest and diaphragm movements necessary for breathing.[1]

---

[1] There also was evidence that Deputy Aviles held Burley in a "head-lock" for much of their struggle, during which time Burley appeared to be gasping for air. Plaintiffs' expert, Dr. Alon Steinberg, testified that an improperly applied chokehold would have intensified the risk of asphyxia by increasing Burley's adrenaline, restricting his airway, and decreasing his blood pressure and heart rate. But Dr. Steinberg also confirmed that, even absent the chokehold, fatal asphyxia was still *probable* due to Aviles's restriction of Burley's diaphragm movement. Because the evidence regarding restraint asphyxia was sufficient to support the battery verdict, we need not address whether

Plaintiffs' medical expert, Dr. Alon Steinberg, a board certified cardiologist, opined that Burley suffered cardiac arrest, ultimately resulting in brain damage and death, because there was "not enough oxygen getting to [his] heart," due to "restraint asphyxia."[2]  Dr. Steinberg explained that in the course of Burley's taxing struggle with the deputies, he would have required "maximum" oxygen intake, circulating rapidly around his body, for his muscles—including, his heart—to function.  He testified that placing someone in Burley's condition "on [his] stomach and in a prone position on [his] chest" can "restrict breathing" and cause "positional asphyxia."  Bearing weight down on the upper or midback of such a person, thereby "keeping" the person "in a position [where he is] having difficulty breathing," intensifies the danger and constitutes "restraint asphyxia."  Restraint asphyxia can result in cardiac arrest, as Dr. Steinberg explained:  "If someone is pressing on your back, you can't move [the] chest out because you have . . . a lot of weight on your chest and you can't breathe out[;] so someone who is extremely dependent on oxygen may not be getting enough oxygen to his lungs, to his blood system[,] and his heart . . . can stop."

Dr. Steinberg also explained that when the body cannot get enough oxygen, it turns to other mechanisms to power its

---

Plaintiffs' secondary theory—that Aviles used an improper carotid hold on Burley—also supported the verdict.

[2]     It was undisputed that Burley died as a consequence of brain damage stemming from cardiac arrest, as Defendants' medical expert, Dr. Michael Chaikin, and the deputy medical examiner who performed Burley's autopsy, Dr. Ajay Panchal, both confirmed.

systems. With continued exertion, such as Burley's protracted struggle to get up from a restrained prone position, these other mechanisms can cause the body to become "acidotic," meaning "he was starting to form a lot of acid in his muscles." Dr. Steinberg testified that the combination of acidosis, and not enough oxygen getting to Burley's heart, caused Burley to "flatline" and suffer "cardiac death." Dr. Steinberg added that his opinion—that Burley's heart stopped due to asphyxiation—was supported by the fact that Burley's heart was revived by paramedics "getting oxygen into his system and doing C.P.R., chest compressions."

Defendants argue the foregoing evidence was insufficient to establish either that asphyxiation caused Burley's heart to arrest, or that Burley suffered asphyxiation as a result of Deputy Aviles's unreasonable use of force. With respect to the first contention, Defendants seize on Dr. Steinberg's reference to the paramedics' use of oxygen to revive Burley, arguing, "[t]hat Burley's heart started beating again after he received oxygen . . . does not by itself prove that the heart stopped from lack of oxygen, given the myriad potential causes of cardiac arrest." As we have explained, Plaintiffs were not required conclusively to rule out all other possible causes of Burley's cardiac arrest; they needed to show only that asphyxiation was more likely than not a substantial contributing factor in causing his fatal condition. (*Uriell, supra,* 234 Cal.App.4th at pp. 745-746; *Espinosa, supra,* 31 Cal.App.4th at p. 1314; see also *Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 791-792 & fn. 7 (*Nelson*) [rejecting argument that expert's testimony regarding positional asphyxia was insufficient to establish causation where other factors might have contributed to detainee's sudden death].)

13

Apart from highlighting the apparent effect oxygen had in reviving Burley's heart, Dr. Steinberg testified that the deprivation of oxygen, coupled with acid building up in Burley's muscles during the struggle, caused Burley's heart to "flatline." Although he acknowledged the presence of drugs in Burley's system probably "played some role," Dr. Steinberg stated the "main" cause of Burley's cardiac arrest was "the fight and the restraint asphyxia." This was sufficient to support the jury's implicit finding that asphyxiation caused Burley's heart to arrest. (See *Espinosa, supra,* 31 Cal.App.4th at p. 1317 [medical expert's opinion sufficient to send causation question to jury, even where he conceded conditions not attributable to defendants' conduct contributed to plaintiff's injury].)

Dr. Steinberg's testimony regarding the mechanics of restraint asphyxia, coupled with Deputy Aviles's admission that he pinned Burley down in a prone position, applying as much weight as he could to the upper and middle parts of Burley's back, was likewise sufficient to support the finding that Aviles's unreasonable use of force caused Burley to asphyxiate. Defendants challenge the evidentiary basis for Dr. Steinberg's opinion, arguing the doctor "did not review the deputies' accounts of the incident before reaching his conclusion." But this argument ignores the settled principle that experts may formulate opinions based upon assumed facts, so long as those facts have evidentiary support. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1045-1046; *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 339.) At trial, Dr. Steinberg affirmed in response to a hypothetical posed by Plaintiffs' counsel that it was "*probable* that[,] after [Burley's] high level of exertion, the compression and restriction of the accessory muscles, diaphragm

14

and other things in the abdominal cavity could cause his death." (Italics added.) Viewing the evidence in the light most favorable to the jury's finding, those assumed facts were consistent with Deputy Aviles's account of his and Burley's positions during the struggle.[3] (See *Vang,* at pp. 1049-1050 [it is the jury's role to "determine whether the facts stated in the hypothetical questions are the actual facts, and the significance of any difference between the actual facts and the facts stated in the questions"].) Dr. Steinberg's testimony was sufficient to support the jury's finding that Deputy Aviles's unreasonable use of force, more likely than not, was a substantial factor in causing Burley's asphyxiation and ultimate death.

c. *The negligence verdict against Deputy Beserra*

The jury found Deputy Beserra acted negligently based on evidence showing Beserra left Burley face-down on his stomach, with his hands cuffed behind his back and his legs hobbled, after Burley had ceased struggling with the deputies. Beserra admitted he heard Burley's breathing become shallow, he felt Burley's body go limp, and he perceived Burley to be in "acute distress." Beserra did not administer C.P.R. to Burley. When paramedics arrived, approximately two minutes after Burley stopped struggling, Captain Henderson of the Compton Fire Department testified he found Burley still face-down on his

---

[3] At trial, Deputy Aviles also reenacted his positioning relative to Burley during the struggle. With defense counsel (substituting for Burley) lying with his chest and stomach on the courtroom floor, Aviles demonstrated how he mounted Burley's back with "his right knee . . . on the back of [defense counsel's] head near his back neck" and his left knee "in the center of [defense counsel's] back" at "the top of his diaphragm."

15

stomach and handcuffed, with Beserra pressing his knee into the small of Burley's back. After asking Beserra to get off Burley and uncuff him, Henderson turned Burley over, discovered he had no pulse, and began administering medical treatment. Lieutenant Clark testified that leaving Burley prone on his stomach was contrary to Beserra's training regarding positional asphyxia. Clark also said Beserra had a duty under the Peace Officer Standards and Training rules to render medical care to Burley once he was handcuffed and no longer struggling.[4]

Defendants contend the evidence was insufficient to support the jury's finding that Deputy Beserra's negligence caused Burley's death, because "no medical expert testified that it was a substantial factor." But this argument ignores Dr. Steinberg's testimony regarding positional asphyxiation, which established that leaving someone in Burley's condition "on [his] stomach and in a prone position on [his] chest," can "restrict breathing" and cause "asphyxia." Indeed, Defendants' medical expert attempted to rule out positional asphyxia, but his opinion relied upon the assumption that once Burley was handcuffed and hobbled, Beserra rolled Burley on his side, as Beserra's training dictated. That assumption was negated by Captain Henderson's account, which the jury presumably credited, that Beserra left Burley in the prone position with his knee in Burley's back. Finally, as discussed, Dr. Steinberg testified that asphyxia was a probable cause of Burley's cardiac arrest, given the mechanics of acidosis, and because Burley's heartbeat was restored once paramedics rendered C.P.R. and administered oxygen. Based on

---

[4]    All California law enforcement officers are required to learn and follow the Peace Officer Standards and Training rules.

this evidence, the jury could reasonably conclude that Beserra's negligent conduct was a substantial contributing factor in causing Burley's death.

2. ***Purported "Irregularities" in the Proceedings Did Not Deny Defendants a Fair Trial***

Defendants contend a series of "irregularities in the proceedings" had the " 'cumulative effect' " of prejudicing the trial's outcome, such that the judgment must be reversed and a new trial ordered. They point to a purported "pattern" of "prejudicial behavior" in which "Plaintiffs' counsel (a) willfully disregarded the court's orders about what could be introduced in opening statements; (b) encouraged the jury in closing argument to weigh public opinion on volatile social issues; (c) exploited an erroneous ruling that permitted Plaintiffs to insinuate, without evidence, that Deputy Aviles belonged to a violent deputy 'gang'; and (d) made improper contact with a juror during deliberations." However, our review of the record reveals that in most cases Defendants either failed to raise a proper objection to the alleged misconduct or failed to press for a curative admonition. With respect to the court's evidentiary ruling regarding a purported "deputy 'gang,' " we find the court reasonably exercised its discretion. And, as for the one inexcusable instance of misconduct—Plaintiffs' counsel's apparent attempt to curry favor with a juror by attending the juror's musical performance during deliberations—we agree with the trial court's conclusion that no prejudice resulted from the incident.

a. *Legal principles and standard of review*

"The law, like boxing, prohibits hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury." (*Martinez v. Department of*

17

*Transportation* (2015) 238 Cal.App.4th 559, 566 (*Martinez*).)
Nonetheless, "[i]n conducting closing argument, attorneys for
both sides have wide latitude to discuss the case." (*Cassim v.
Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795 (*Cassim*).) " ' " 'The
argument may be vigorous as long as it amounts to fair comment
on the evidence, which can include reasonable inferences, or
deductions to be drawn therefrom.' " ' " (*People v. Stanley* (2006)
39 Cal.4th 913, 951-952.) The same rules generally apply to the
cross-examination of witnesses. (See *McDonald v. Price* (1947)
80 Cal.App.2d 150, 152 ["While a wide latitude should be given in
cross-examinations, counsel in putting questions to the witness
should not be allowed to assume facts not in evidence and . . . of
such a nature as to inflame and prejudice the minds of the
jurors."].)

     "An attorney who exceeds this wide latitude commits
misconduct. For example, '[w]hile a counsel in summing up may
indulge in all fair arguments in favor of his client's case, he may
not assume facts not in evidence or invite the jury to speculate as
to unsupported inferences.' " (*Cassim, supra,* 33 Cal.4th at
p. 796.) Nor may an attorney make arguments by innuendo in a
manner calculated to inflame the passions, prejudices, or
sympathies of the jury. (See, e.g., *Stone v. Foster* (1980) 106
Cal.App.3d 334, 353-356 [plaintiff's counsel insinuated defendant
doctor was part of " 'conspiracy of silence' " by medical industry];
*Dastagir v. Dastagir* (1952) 109 Cal.App.2d 809, 821-822 [in
paternity case, defense counsel made repeated unsupported
suggestions that plaintiff's mother had illicit relations with other
men].) And, while "[c]ounsel may refer the jury to nonevidentiary
matters of common knowledge, or to illustrations drawn from
common experience, history, or literature [citation], . . . he may

not dwell on the particular facts of unrelated, unsubstantiated cases." (*People v. Mendoza* (1974) 37 Cal.App.3d 717, 725.)

" 'Generally, to preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial.' [Citation.] In addition to objecting, a litigant faced with opposing counsel's misconduct must also 'move for a mistrial or seek a curative admonition' [citation] unless the misconduct is so persistent that an admonition would be inadequate to cure the resulting prejudice [citation]. This is so because '[o]ne of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks and thus obviate the necessity of a new trial.' " (*Cassim, supra,* 33 Cal.4th at pp. 794-795.)

It is not enough for an appealing party to show attorney misconduct. "In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial." (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 149; *Cassim, supra,* 33 Cal.4th at p. 800.) As to this issue, the reviewing court makes "an independent determination as to whether the error was prejudicial." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872.) We "must determine whether it is reasonably probable [that the appellant] would have achieved a more favorable result in the absence of that portion of [attorney conduct] now challenged." (*Cassim,* at p. 802.) We must examine "the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of [counsel's] argument," to determine whether misconduct occurred and whether it was sufficiently egregious to cause prejudice. (*Ibid.*; *Garcia,* at p. 149.) "Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as

19

the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances." (*Sabella v. Southern Pacific Company* (1969) 70 Cal.2d 311, 320-321 (*Sabella*), fn. omitted; *Garcia,* at p. 149; *Martinez, supra,* 238 Cal.App.4th at p. 568.)  "[I]t is only the record as a whole, and not specific phrases out of context, that can reveal the nature and effect of such tactics." (*Sabella,* at p. 318.)

      b.     *References to alleged prior incidents of unreasonable force in opening statement*

Before trial commenced, Defendants moved in limine to exclude all references to prior citizen complaints against the deputy defendants.  After discussing Plaintiffs' ongoing efforts to interview potential witnesses, the court stated it would "hold this in abeyance" until Plaintiffs had identified the relevant witnesses, at which time the court would "revisit" the motion to weigh the probative value of the witnesses' testimony against any claimed prejudice.  When Plaintiffs' counsel inquired about whether he was precluded from mentioning prior citizen complaints in his opening statement, the court responded, "Can't do it unless we know who -- what witnesses."

Despite the court's instruction, and without giving the court and defense counsel an opportunity to "revisit" the issue, Plaintiffs' counsel announced to the jury in his opening statement that "[y]ou will hear from witnesses that Mr. Aviles used unreasonable unnecessary force against [them]."  Counsel then

detailed what the two proposed witnesses—Jeffrey Davis and Bobby Willis—would testify about the alleged incidents.[5]

After Plaintiffs' opening statements, defense counsel objected that the references to "Mr. Jeffrey Davis and Bobby Willis" violated the court's in limine order. The court agreed, and offered to give a limiting instruction to cure the potential prejudice. Critically, however, after the court invited Defendants to prepare the instruction, defense counsel *declined* to do so. The failure to press for a corrective admonition forfeits the issue for appeal. (*Cassim, supra,* 33 Cal.4th at pp. 794-795.)

Defendants argue there was no forfeiture because, in making the offer to give a limiting instruction, the court observed that the objectionable references were "lost in the totality of openings, and [Defendants] run the genuine risk of emphasizing it if I emphasize it." Defendants maintain pressing for an admonition was unnecessary to preserve the issue, as the court's statement showed a limiting instruction would not have " 'removed the effect' of the misconduct." (See *Sabella, supra,* 70 Cal.2d at p. 318 [" 'alleged misconduct will not be considered on appeal, if an admonition to the jury would remove the effect' "].) We disagree.

Far from suggesting the "misconduct [was] so persistent that an admonition would be inadequate to cure the resulting prejudice" (*Cassim, supra,* 33 Cal.4th at pp. 794-795), the court apparently found the offending references to be so inconsequential and fleeting as to have been "lost in the totality

---

[5]    Ultimately, neither witness testified. The court excluded Davis's testimony under Evidence Code section 352, and Plaintiffs elected not to call Willis.

of openings." Of course, Defendants were entitled to disagree with the court's assessment, but then it was their duty to press for a curative admonition to address the perceived prejudice. Their failure to do so forfeits the issue for appeal. (*Ibid*.)

      c.     *Questions regarding a purported "deputy gang"*

Before trial, Defendants moved in limine to exclude references to alleged membership in " 'deputy gangs.' " The motion argued these purported groups had received "[n]egative publicity" in the media, and that evidence of the deputies' affiliation with them would constitute irrelevant and highly prejudicial character evidence under Evidence Code section 1101, subdivision (a).[6]

At a hearing on the motion, Plaintiffs asserted that Deputy Aviles had admitted in deposition testimony that he belonged to the so-called "3000 boys" and that he "was the subject of 19 separate use of force incident reports over a period of three-and-a-half to four years, while he was serving in the county jail on the 3000 floor." They maintained "[a] majority of those incidents involved reports of him brutalizing persons in his custody for no reason, which is consistent with the practice of the 3000 boys," as had been reported by the Los Angeles Times in an investigation published in 2012. Plaintiffs argued the evidence was admissible to impeach Aviles's anticipated claim that he used reasonable force in restraining Burley.

---

[6]    As an example of the negative media attention, the motion referenced a 2013 Los Angeles Times article about a "secret law enforcement group called 'The Jump Out Boys' that allegedly celebrated shootings and branded members with matching tattoos."

22

The trial court agreed with Plaintiffs, ruling: "I'm going to . . . allow . . . questioning as to whether there was [a] formal or informal comradeship association of the deputies on the 3000 floor. [¶] I think it's directly relevant to address Deputy Aviles'[s] expected testimony that whatever force he applied was reasonable and necessary . . . . [¶] . . . [¶] If [Aviles] does in fact deny [the association] . . . , Plaintiffs may well fall flat on their evidentiary face, if they can't prove it." Insofar as the court denied the motion in limine on the ground that the evidence of prior acts would be relevant to impeach Deputy Aviles's claim that he used reasonable force in response to Burley's resistance, we find no abuse of discretion. (See *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 983 [evidence of prior excessive force claims admissible to impeach defendant deputy's testimony that he "used measured responses to gain control of [plaintiff]"; observing, "[Evidence Code] section 1101 does not affect 'the admissibility of evidence offered to support or attack the credibility of a witness' "].)

Nonetheless, Defendants argue the "tactics permitted by the court were highly prejudicial," because "the jury heard opening statements and repeated questions about Deputy Aviles's purported membership in a deputy 'gang' at the Los Angeles County Jail." They argue "references to gang membership are especially prejudicial," observing that in the "criminal context, gang evidence 'should not be admitted if its probative value is minimal. . . . [and] trial courts should carefully scrutinize such evidence before admitting it.' " Here, however, though the court permitted limited inquiry about Aviles's association with deputies on the 3000 floor, the court sustained Defendants' objections to questions referencing "gangs" and other

23

inflammatory terminology.  The following testimony, excerpted by Defendants in their opening brief, is representative:

> "**[Plaintiffs' Counsel:]**  You have heard that there is a gang of deputies on the 3000 floor who brutalize suspects, or brutalize person[s] in their custodies; you've heard that, right?
>
> "**[Defendants' Counsel]:**  Objection. Relevance.
>
> "**The Court:**  Sustained.  Argumentative, as [to] some of the words that you used.
>
> "**[Plaintiffs' Counsel:]**  You've heard that there's a group of deputies that work the 3000 floor that use excessive force on persons in their custody?
>
> "**[Defendants' Counsel]:**  Objection. Assumes facts not in evidence.
>
> "**The Court:**  I'll allow that.  He cleaned up the two words that were argumentative. Overruled.
>
> "Go ahead, sir.
>
> "**[Deputy Aviles]:**  According to the media."

The jury was instructed that what the attorneys say during trial—in their opening statements, closing arguments, and questions—"is not evidence," and the jury "should not think that something is true just because an attorney's question suggested it was true."  Still, Defendants maintain that, "[a]lthough the court sustained some objections to Plaintiffs' counsel's persistent use of gang terminology, the suggestion that Deputy Aviles belonged to

24

a violent 'gang' remained."  In view of our presumption that the jury follows its instructions (*Cassim, supra,* 33 Cal.4th at pp. 803-804), we find no merit in this claim.  In any event, if Defendants were concerned that the "suggestion" of gang membership "remained," it was their obligation to request an admonition after the trial court sustained their objections to the gang terminology. (See *id.* at pp. 794-795.)  Their failure to do so forfeits the issue.

        d.    *References to outside current events in closing argument*

This case came to trial in the wake of the widely publicized deaths of Michael Brown and Eric Garner, two unarmed black men who were killed in incidents with police.  Defendants argue the trial court permitted Plaintiffs' counsel to exploit those incidents in their closing arguments, thus supplanting the actual evidence in this case and encouraging the jury to make liability findings on an improper basis.  They maintain the purported improper arguments were made "[o]ver Defendants' objections." The record refutes this fundamental premise of Defendants' argument.

Following the decisions by grand juries in New York and Missouri not to indict the police officers involved in the deaths of Eric Garner and Michael Brown, Plaintiffs' attorney notified the court and defense counsel of his intention to make "fair comment" on the Garner and Brown matters in connection with discussing issues related to "the public's confidence in law enforcement" that he characterized as "rife in this case."  Without specifying grounds for objection, Defendants' counsel responded, "I hope when [Plaintiffs' counsel] says fair comment that he's not going [to] make reference, as he did earlier in this case when he mentioned the Ferguson, Missouri, incident[,] that he's not going

25

to go anywhere near any of these incidents for the remainder of this case." At that point, the trial court stated its understanding that Plaintiffs' counsel meant only to refer to the matters in "his closing argument" and observed that reference to current events, in that context, would be "fair game." When Plaintiffs' counsel confirmed that limitation, Defendants' counsel made no objection; he did not object that such references would be improper even in closing argument, and he did not dispute the court's suggestion that references to current events in closing argument would be "fair game."

Defendants' counsel returned to the Garner and Brown matters later in the proceeding, but this time counsel indicated Defendants objected to references only in the evidentiary phase of the trial—not in closing argument. Shortly after the initial exchange, counsel declared, "I am concerned that even though [Plaintiffs' counsel] stated that he only intends to approach the Eric Garner incident in his closing argument, I'm concerned there could be reference to it in his direct examination" of Plaintiffs' witnesses. Plaintiffs' counsel confirmed there would be no such references, and the court admonished Plaintiffs not to raise the Garner and Brown matters during the evidentiary phase. During closing arguments, when Plaintiffs' counsel quoted Garner's well-known protest, "I can't breathe," and later argued, in apparent reference to Brown's death, "We can't wait on Missouri to get their acts together," Defendants did not object.

As discussed, a charge of misconduct by opposing counsel is not preserved for appeal unless the record shows the appellant made a timely and specific objection. (*Cassim, supra,* 33 Cal.4th at pp. 794-795; *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1412 (*Rayii*); *People v. Pitts* (1990) 223 Cal.App.3d 606, 691-692.) The

purpose of this requirement is to "allow the trial court an opportunity to remedy the misconduct and avoid the necessity of a retrial."  (*Rayii,* at p. 1412; *Cassim,* at pp. 794-795.)

Defendants insist they did not forfeit the claim of misconduct, citing *People v. Antick* (1975) 15 Cal.3d 79, 95 (*Antick*) for the proposition that " '[w]here a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter' " to preserve the issue for appellate review.  The principle is inapposite to this case.

In *Antick*, the Supreme Court found that, contrary to the People's assertion on appeal, "defense counsel *did* object" to the introduction of other-crimes evidence, and, in a subsequent hearing outside the jury's presence, "made . . . arguments on its admissibility" before the trial court overruled a "reasserted" objection to introduction of the evidence through an additional witness.  (*Antick, supra,* 15 Cal.3d at p. 95.)  Here, in contrast, the record shows Defendants' counsel made no argument as to why he disagreed with Plaintiffs' request to make "fair comment" on matters of common knowledge, and, critically, counsel stated no *specific ground* for his "hope" that Plaintiffs' counsel would not "go anywhere near any of these incidents for the remainder of this case."  Moreover, counsel's silence when the trial court clarified that Plaintiffs intended to reference the incidents only in their closing argument strongly indicated Defendants acquiesced to the limitation.  Indeed, this acquiescence was all but confirmed when counsel later voiced concern, not that Plaintiffs would discuss the Brown and Garner incidents in closing arguments, but that they might reference the incidents in direct examination

27

of witnesses.  When the trial court confirmed that examination on those matters would not be permitted, Defendants made no further objection or request for admonition.

On this record, the trial court had no reason to know Defendants objected to the limitation imposed by its ruling, and the court had no opportunity to prevent or correct the purported misconduct that Defendants assert now on appeal.  We conclude Defendants forfeited the issue by failing to make a specific objection.  (See *JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178 ["[F]airness is at the heart of a waiver claim.  Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider."]; *Rayii, supra,* 218 Cal.App.4th at p. 1412.)

> e.　*Plaintiffs' counsel's improper attempt to curry favor with a juror*

We now address a deeply troubling incident that all parties agree was, at a minimum, an act of exceedingly "bad judgment" by one of Plaintiffs' attorneys, Carl Douglas.[7]

During jury deliberations, and before the court recessed for 12 days on December 17, 2014, a juror mentioned in court that his musical group would be performing in San Pedro on December 19.  Apparently suspicious of the potential for misconduct, Defendants hired an investigator, who observed attorney Douglas at the juror's performance.  When court

---

[7]　The trial court found that the attorneys for all other Plaintiffs "did not know of, plan, encourage or in any way condone Mr. Douglas'[s] actions."

28

resumed on December 29, Defendants reported these developments and moved to recuse the juror. The trial court took evidence from the investigator, including photographs and video from the night of the performance, and the court and defense counsel questioned the juror.

The investigator testified there were slightly more than one hundred attendees at the performance, including Douglas and his female companion, who were seated at a table one row back from the front with four other attendees. Although the performance took place in a relatively intimate banquet hall, in which the juror, as lead singer of the musical group, moved freely around the room interacting with guests, the investigator reported that he never saw the juror and Douglas interact with each other during the 45-minute performance. The juror also did not appear to acknowledge Douglas or any of the attendees seated at his table during the performance. None of the pictures or video produced by the investigator captured Douglas and the juror in the same frame.

The juror said he did not remember seeing anyone involved in the trial (witnesses, attorneys, parties, fellow jurors) at the performance. He did not discuss the performance with his fellow jurors, other than to tell them it went "great." When asked directly by Defendants' counsel if he had seen Douglas at the performance, the juror responded, "Not that I recall, no." The court reassured the juror that he had done "absolutely nothing wrong," and that the attorneys would explain everything after the trial was over.

The trial court denied Defendants' motion to recuse the juror. The court found Douglas's conduct, "at the very minimum," was an act of "bad judgment," but that it did not affect the

deliberations or prejudice the case. The court explained: "[L]ooking at and talking to [the juror], . . . I find him to be credible, sincere, personable. He didn't hesitate in answering any questions from anybody. [¶] I find factually there was no contact either directly or indirectly between Mr. Douglas and [the juror]. [¶] I accept and believe [the juror] when he said that he did not see Mr. Douglas. He said nothing to the fellow jurors about the evening other than he performed and it went well." The court added, "I've seen nothing [i]n the photographs or videos that would contradict my findings." Thus the court concluded, "there was no prejudice at all to this case" and "[i]t had no effect on the deliberations."

After Defendants moved for a new trial and submitted a declaration from the event organizer suggesting that Douglas might have sat with the juror's family during the performance, the court held another evidentiary hearing. The evidence at the hearing showed Douglas was aware the juror would be performing when he purchased his ticket, and that he sat at the same table where the juror's sister-in-law was seated. Douglas testified that he attended the event at the request of his female companion, whose friend was a member of the juror's musical group, and he chose his seat when he arrived, unaware that the juror's sister-in-law was seated at the same table.

The trial court denied Defendants' new trial motion. Although the court determined Douglas's conduct was "inexcusable, short-sighted and displayed a gross lapse of judgment," it found again that "[the juror was] credible when he said he never saw Mr. Douglas and that there was no communication between them." Relying upon *In re Price* (2011) 51 Cal.4th 547 (*Price*), the court concluded, "There was no

30

communication; neither the juror nor the jury were tainted." In view of the court's finding, and the substantial evidence that supported it, we agree with the trial court's conclusion that the jury was not tainted and no prejudice resulted from Douglas's misconduct.

*Price* is controlling. In *Price*, our Supreme Court considered whether a prosecutor's contact with a juror during the guilt phase of a capital murder case deprived the defendant of a fair trial. (*Price, supra,* 51 Cal.4th at p. 549.) A referee appointed to conduct an evidentiary hearing on disputed questions of fact raised by the defendant's petition for habeas corpus found: (1) the prosecutor patronized a café where the juror was working during the guilt phase of the defendant's trial; (2) when the juror presented the prosecutor with a menu, the prosecutor recognized the juror, held up his hands, and said he could not have any contact with her; (3) when the prosecutor finished dining, he paid the bill and included a tip, telling the bartender, "in a joking tone of voice, to 'give this' or 'split this' with [the juror] and 'tell her to vote guilty' "; and (4) notwithstanding conflicting reports, the bartender understood the comment as a joke and did not convey any message from the prosecutor to the juror. (*Id.* at pp. 549-551.) Deferring to the referee's credibility determinations, the Supreme Court concluded the referee's critical finding—that the bartender had not communicated the prosecutor's "joke" to the juror—was supported by the evidence. (*Id.* at p. 561.) In view of that finding, the court held the brief contact between the prosecutor and juror "did not include any communication of significance," and, as "the only proven juror contact was not improper, there was no obligation to report it to the judge presiding at [the

31

defendant's] trial." (*Id.* at p. 562.) Thus, the Supreme Court held the defendant failed to establish the trial was tainted by the incident. (*Id.* at p. 563.)

Here, although Douglas's conduct was clearly improper, the trial court found, consistent with the evidence and its credibility determinations, that there was *no contact* between Douglas and the juror. In view of that finding, *Price* compels the conclusion that the trial was not tainted and that Douglas's misconduct did not result in any prejudice to Defendants. (See *Price, supra,* 51 Cal.4th at p. 560 [" 'the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor' "].)

Defendants contend the trial court's finding is not conclusive, because even if the juror had no contact with Douglas, he still "surely knew Mr. Douglas had attended once he was questioned about it." Thus, Defendants maintain "[t]he potential for [the juror] to appreciate Mr. Douglas's attendance and resent defense counsel's inquiries sharply distinguishes this episode from [*Price*]." We agree with Plaintiffs that this circular argument proves too much. By Defendants' logic, the fact of misconduct alone would compel reversal, because any inquiry into whether an attorney actually succeeded in currying favor with a juror would itself create "at least unconscious bias" and "actual prejudice." That reasoning cannot be squared with the Supreme Court's prejudice analysis in *Price*. (*Price, supra,* 51 Cal.4th at pp. 560-563.)

3. ***The Jury Was Properly Instructed and Substantial Evidence Supports the Damages Award***

Defendants maintain they are entitled to a new trial on damages because (1) the trial court misstated the law to the jury

32

regarding the evidence it could consider in determining the appropriate amount of noneconomic damages; and (2) the award is excessive and not supported by substantial evidence. Neither contention has merit.

      a.    *Instruction regarding noneconomic damages*

Before closing arguments, the court instructed the jury as follows regarding the assessment of noneconomic damages: "Plaintiffs claim the following noneconomic damages: [¶] The loss of Darren Burley's love, companionship, comfort, care, assistance, protection, affection, society, moral support. [¶] No fixed standard exists for deciding the amount of noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense. . . . [¶] In determining Plaintiffs' loss, do not consider: [¶] 1. Plaintiffs' grief, sorrow, or mental anguish; [¶] 2. Darren Burley's pain and suffering; or [¶] 3. The poverty or wealth of Plaintiffs. [¶] In deciding a person's life expectancy, you may consider, among other factors, the average life expectancy of a person of that age, as well as that person's health, habits, activities, lifestyle, and occupation."

Defendants do not quarrel with the foregoing instruction. Instead, they argue the trial court erred by supposedly giving a *new* instruction, during Plaintiffs' closing argument, that "foreclosed the jury's consideration of a considerable body of relevant evidence" in assessing noneconomic damages. Defendants base their contention on the following exchange, which both parties agree is missing a speaker reference at some point following the trial court's admonition:

      "**[Plaintiffs' Counsel:]** According to the life expectancy table, [Burley would] live well

33

into his 70's. . . . Some people live longer and others die sooner.

"Which -- I'm going to be fair to [Defendants' counsel] -- I would suspect that's why she was going through all those things[,] so you can consider that maybe his lifestyle would not have dictated he live a full 30-plus years. But sneakily, under the table, I would suspect that she's trying to, once again, dehumanize him. He was around having babies here and there, having affairs here and there; therefore, he's not worthy of you guys giv[ing] him a whole lot of money too. No, you can't consider that ladies and gentlemen.

"Now with respect to awarding damages on the loss of the comfort, society, compassion. Separate those two. The --

"**[Defendants' Counsel]:** Your Honor, I'm going to object that, that misstates the law.

"**The Court:** I have read the jury the law, and the jurors will follow the law as stated to them. Separate the two, ladies and gentlemen, [Defendants' counsel] doesn't want you to, but separate the two.

"Okay. So I'm an honest person, I'm not going to suggest to you that with his lifestyle, maybe he would not have made it to 70-whatever years, could or could not."

Defendants acknowledge a speaker reference is missing, but they contend the second directive to "[s]eparate the two" was

34

properly attributed to the trial court. Thus, Defendants argue the court erred by "expressly instruct[ing] that the jury was to separate decedent's character and conduct from any determination of his family's loss." This is not the most reasonable reading of the record.

Just before Defendants' objection, Plaintiffs' counsel asked the jury to "[s]eparate those two." In the subsequent exchange, the most plausible switch between speakers occurs directly after the court admonishes the jury to follow the instructions previously given, at which point Plaintiffs' counsel appears to have resumed his argument where he left off, asking the jury to "[s]eparate the two, ladies and gentlemen." Indeed, the substance of the court's admonition logically undermines Defendants' reading. By Defendants' account, the court at once admonished the jury to "follow the law as stated to them" *prior* to closing arguments, while, in the next breath, giving the jury a *new* instruction to separate Burley's conduct from any determination of noneconomic damages. As the record is effectively silent as to where the missing speaker reference belongs, we will not presume the court abused its discretion when a fair and more reasonable reading of the transcript suggests no error occurred. (See *Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564 [an abuse of discretion will not be presumed from a silent record; error must be affirmatively shown].)

Setting the missing speaker reference aside, Defendants argue the trial court committed reversible error by refusing to sustain their objection. Defendants contend Plaintiffs' counsel misstated the law by asking the jury to " 'separate' their 'moral judgments' of Mr. Burley from their determination of the value of

35

his loss." Because the jury was expressly instructed to "rely on their 'judgment' to determine the value of, among other things, the decedent's 'moral support,' " Defendants maintain the court was obliged to sustain their objection to the argument. We find no error in the court's ruling.

As we have discussed, in delivering summation arguments, counsel have wide latitude to discuss the merits of a case, both as to the law and facts. (*Cassim, supra,* 33 Cal.4th at p. 795.) Here, Plaintiffs' counsel fairly argued the jury should not conclude Burley's life was "not worthy" of compensation for his children simply because he had done bad things in his past. The argument did not misstate the law; it simply asked the jury, in exercising its "judgment" and "common sense," to put its moral judgments to one side and to focus on evidence that reflected favorably on Burley and his relationship with his children. Not surprisingly, Defendants' counsel advanced an opposing view of the law and facts in her closing, asking the jury to focus on evidence showing Burley's "children do not have him here today . . . because of the life that he led."[8] None of this was improper, and all of it was within the bounds of counsel's wide latitude to "vigorously argue" their case to the jury. (*Ibid.*) In response to Defendants' objection, the court admonished the jurors to "follow the law as stated to them." We have no reason to doubt that the jury followed the court's directive. (See *People v. Forrest* (2017)

---

[8] Defendants' counsel went on to argue, "what you do have to do is evaluate who he was[,] [b]ecause who he was is a measure of what you can look at." She emphasized, "if he's out in the street high on PCP, he's not home with these five children" and "[i]f he's out in the street committing a crime, then he's not at home with these five children."

36

7 Cal.App.5th 1074, 1086 ["we presume the jury followed the court's instructions over any misstatements of law by the prosecutor"].)

  b.   *Substantial evidence supports the noneconomic damages award*

Defendants contend the evidence was insufficient to justify an award of $8 million in noneconomic damages for the loss suffered by Burley's estranged wife and his five children.  They argue undisputed evidence "revealed that [Burley's] contact with his children was sporadic" and that any inferences to be drawn from evidence bearing favorably on Burley's relationship with Plaintiffs "must be significantly qualified by uncontradicted evidence about his absences due to drug use, incarceration, hospitalization for violent injury, and a restraining order requested by one of the mothers of his children."  In denying Defendants' motion for a new trial, the trial court independently weighed the conflicting evidence and rejected Defendants' contention that it was insufficient to support the jury's award.  We find no error in the court's ruling.

A jury's determination of the amount that will compensate children and other family members for the loss of a parent's comfort and society is subject to "very narrow appellate review." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614 (*Rufo*) [addressing noneconomic damages for parents' loss of an adult child].)  "First, the contention that the evidence does not support the verdict is reviewed under the substantial evidence standard. In reviewing a claim of insufficiency of evidence, the appellate court must consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to

the trier of fact's determination of the weight and credibility of the evidence.  [Citations.]  Second, the appellate court ordinarily defers to the trial court's denial of a motion for new trial based on excessive damages, because of the trial judge's greater familiarity with the case.  [Citations.]  The trial judge has greater discretion to reduce the damages on a motion for new trial than the appellate court has on appeal." (*Ibid*.)  This is because the trial court "is bound by the 'more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule.' " (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259 (*Fortman*).)  "If the trial judge denied the motion, concluding the award was not excessive, the appellate court gives weight to the trial court's conclusion.  [Citations.] Third, the amount which may compensate the loss of comfort and society is peculiarly within the discretion of the jury.  There is no fixed standard by which the appellate court can determine whether the jury's award for this intangible loss is excessive.  The appellate court usually defers to the jury's discretion in the absence of some other factor in the record, such as inflammatory evidence, misleading instructions or improper argument by counsel, that would suggest the jury relied upon improper considerations.  [Citations.]  The appellate court will interfere with the jury's determination only when the award is so disproportionate to the injuries suffered that it shocks the conscience and virtually compels the conclusion the award is attributable to passion or prejudice." (*Rufo,* at pp. 614-615; see also *Fortman,* at p. 259 ["It is well settled that damages are excessive only where the recovery is so grossly disproportionate to the injury that the award may be presumed to have been the result of passion or prejudice."].)

In a wrongful death action, noneconomic damages include recovery for the loss of love, assistance, moral support, society, comfort, care, companionship, and protection of a deceased parent. (*Krouse v. Graham* (1977) 19 Cal.3d 59, 67-68; *Rufo, supra,* 86 Cal.App.4th at p. 614.) "Factors such as the closeness of a family unit, the depth of their love and affection, and the character of the decedent as kind, attentive, and loving are proper considerations for a jury assessing noneconomic damages." (*Soto v. BorgWarner Morse TEC Inc*. (2015) 239 Cal.App.4th 165, 201.) A jury may also consider the deceased parent's bond with his children, the frequency of their communication, and whether the parent participated in the children's discipline, school work, and other activities. (*Yates v. Pollock* (1987) 194 Cal.App.3d 195, 201; *Allen v. Toledo* (1980) 109 Cal.App.3d 415, 424.)

Here, Burley's two older daughters (ages 12 and seven at the time of his death) testified to the loving bond they had with their father. His oldest daughter talked about her dad visiting her school, how she introduced him to her teachers and the pride she had in showing him around. She testified that he helped her with her homework, taught her to play basketball, and that she enjoyed doing "father and daughter things together." Burley's younger daughter testified that he helped her with homework and comforted her when she was hurt. She missed going to the park and ice cream shop with him, hugging him, and telling him she loved him. The evidence showed Burley attended most of the girls' school ceremonies and graduations, and, even after separating from their mother, he visited the girls twice a week.

Burley's estranged wife, Rhandi T., described Burley as a kind, fun, and genuine person. They were married in 2007 and had two sons together in 2008 and 2010. The evidence showed

Burley attended prenatal doctor visits with Rhandi T. and that he was actively involved in the birth of both sons. Despite their marital discord, and Rhandi T.'s relocation to Atlanta in 2010, Burley continued to video chat with the boys at least twice a week, and he sent his sons clothes, shoes, and letters telling them he loved them and missed them.

There was similar evidence of Burley's bond with his youngest daughter, also born in 2010. Burley sang to her, taught her to write her name and to say her ABC's, and the two colored and played with toys together. Burley lived with his youngest daughter after his release from prison in 2011, and he often brought her to his weekly visits with his two older daughters.

Much as they had in their motion for new trial, here, Defendants emphasize other evidence showing Burley used drugs, was unfaithful to his wife and girlfriends, had multiple arrests, and was incarcerated for approximately eight months shortly after his youngest daughter's first birthday. Notwithstanding our substantial evidence standard of review, Defendants maintain this other evidence cannot be ignored because Plaintiffs' favorable testimony about their relationship with Burley "must be understood in light of the totality of the evidence." But evaluating conflicting evidence and drawing inferences and conclusions in light of the totality of the evidence is precisely what we presume the jury did in reaching its damages verdict, and what the trial court did in independently *weighing the evidence* before denying Defendants' new trial motion. (*Rufo, supra,* 86 Cal.App.4th at pp. 614-615.) So long as there was substantial evidence to support the judgment, we are obliged to defer to the jury's and trial court's determinations

40

about what weight conflicting evidence should receive.  (*Id.* at p. 614.)

The jury was properly instructed with respect to noneconomic damages, and nothing in the record clearly establishes the jury relied upon improper considerations. Although the verdict is very large, this alone does not compel the conclusion that the award resulted from passion or prejudice. (*Rufo, supra,* 86 Cal.App.4th at p. 615.)  A "result which requires reversal should clearly appear from the record.  We are unable to say, as a matter of law, that the judgment in this case is so excessive as to warrant us in interfering with the finding of the jury." (*DiRosario v. Havens* (1987) 196 Cal.App.3d 1224, 1241-1242; see *Rufo,* at pp. 613-616 [affirming $8.5 million noneconomic damages award to parents for wrongful death of their adult son].)

4.    ***Civil Code Section 1431.2 Mandates Comparative Fault Apportionment, Even When Tortious Conduct Is Intentional***

Defendants contend the trial court erred by failing to apportion damages according to the jury's comparative fault determinations.  Despite the jury's decision to allocate only 20 percent of the fault for Burley's death to Deputy Aviles, the judgment makes him liable for 100 percent of the total noneconomic damages award.  Defendants argue this allocation conflicts with the unambiguous mandate of Civil Code section 1431.2 that "[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault."  (Civ. Code,

41

§ 1431.2, subd. (a).)[9]  We agree, and will therefore direct the trial court to enter a separate judgment against Aviles, imposing liability for the noneconomic damages award in an amount proportionate to the jury's comparative fault determination.

In June 1986, the voters approved an initiative measure, the Fair Responsibility Act of 1986 (codified as sections 1431 to 1431.5 of the Civil Code and popularly known as Proposition 51), which "modified the traditional, common law 'joint and several liability' doctrine, limiting an individual tortfeasor's liability for noneconomic damages to a proportion of such damages equal to the tortfeasor's own percentage of fault."  (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1192 (*Evangelatos*).)  The operative statute provides in relevant part:

> "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint.  Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."  (§ 1431.2, subd. (a).)

By its terms, section 1431.2 imposes "a rule of strict proportionate liability" on noneconomic damages (*DaFonte v. Up-*

---

[9]    Further statutory references are to the Civil Code, unless otherwise designated.

*Right, Inc*. (1992) 2 Cal.4th 593, 600 (*DaFonte*)), under which "each defendant is liable for only that portion of the plaintiff's noneconomic damages which is commensurate with that defendant's degree of fault for the injury" (*Evangelatos,* at p. 1198). (*Rashidi v. Moser* (2014) 60 Cal.4th 718, 722.)

In determining Deputy Aviles was liable for the entire $8 million noneconomic damages award, the trial court relied upon *Thomas v. Duggins Construction Co., Inc.* (2006) 139 Cal.App.4th 1105 (*Thomas*). *Thomas* holds that section 1431.2 does not apply to an *intentional* tortfeasor's liability in a personal injury case. (*Id*. at pp. 1112-1113.) While the trial court was obliged to follow *Thomas* as controlling Court of Appeal precedent, we are not bound by the opinion in reviewing the judgment on appeal. (See *Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1193 ["there is no horizontal stare decisis in the California Court of Appeal"].) Because we conclude *Thomas* conflicts with the plain text of section 1431.2, we decline to follow its holding.

"Issues of statutory construction as well as the application of that construction to an undisputed set of facts are questions of law subject to independent review on appeal." (*Lee v. Silveira* (2015) 236 Cal.App.4th 1208, 1214.) When construing a statute, we must ascertain the intent of the legislation so as to effectuate the purpose of the law. (*DuBois v. W.C.A.B.* (1993) 5 Cal.4th 382, 387.) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.] When ' "statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it." ' [Citations.] The plain meaning of words in a statute may be disregarded only when that meaning is

43

' "repugnant to the general purview of the act," or for some other compelling reason . . . .' [Citations.] These principles apply as much to initiative statutes as to those enacted by the Legislature." (*DaFonte, supra,* 2 Cal.4th at p. 601.)

In *DaFonte*, our Supreme Court concluded the plain language of section 1431.2 unambiguously applied in "every case" to shield "every 'defendant' " from joint liability for noneconomic damages not attributable to his or her own comparative fault. (*DaFonte, supra,* 2 Cal.4th at p. 602.) The plaintiff in *DaFonte* was injured at work when he crushed his hand in a mechanical grape harvester. He received benefits from his employer's workers' compensation insurer and sued the harvester's manufacturer for negligence and product defect. (*Id*. at p. 596.) At trial, the manufacturer sought to reduce its liability by demonstrating the employer's negligent safety policies were partly responsible for the injury. (*Ibid*.) The plaintiff prevailed, but the jury allocated 45 percent of the fault to his employer, and the trial court commensurately reduced the noneconomic damages award against the manufacturer. (*Id*. at pp. 596-597.) The plaintiff appealed, arguing the manufacturer's liability should not be reduced because the employer was immune from tort liability under the workers' compensation law, and the refusal to infer an exception to section 1431.2 would "destroy the 'delicate' preexisting balance among the rights of employee, employer, and third party tortfeasor." (*Id*. at p. 603.)

44

The Supreme Court rejected the *DaFonte* plaintiff's argument that preexisting law compelled an exception to section 1431.2's unambiguous directive. The court explained: "Section 1431.2 declares plainly and clearly that in tort suits for personal harm or property damage, no 'defendant' shall have 'joint' liability for 'non-economic' damages, *and* '[e]ach defendant' shall be liable 'only' for those 'non-economic' damages directly attributable to his or her own 'percentage of fault.' The statute neither states nor implies an exception for damages attributable to the fault of persons who are immune from liability or have no mutual joint obligation to pay missing shares. On the contrary, section 1431.2 expressly affords relief to every tortfeasor who *is* a liable 'defendant,' and who formerly *would* have had full joint liability." (*DaFonte, supra,* 2 Cal.4th at p. 601.) Further, in rejecting the lower appellate court's interpretation—premised on the reasoning that Proposition 51 amended only the portion of the Civil Code dealing with "Joint or Several Obligations," while leaving other statutory maxims intact—the Supreme Court reemphasized the point: "[S]ection 1431.2 itself contains *no ambiguity* which would permit resort to these extrinsic constructional aids. The statute plainly attacks the issue of joint liability for noneconomic tort damages root and branch. [¶] In *every case*, it limits the joint liability of every 'defendant' to economic damages, and it *shields every 'defendant' from any share of noneconomic damages beyond that attributable to his or her own comparative fault*." (*DaFonte,* at pp. 601-602, italics added.)

45

Without discussing or even citing the *DaFonte* opinion, the Court of Appeal in *Thomas* held that section 1431.2 *did not* shield a defendant found liable for an intentional tort from responsibility for noneconomic damages attributable to the comparative fault of others. (*Thomas, supra,* 139 Cal.App.4th at p. 1113.) The plaintiffs in *Thomas* sued the seller of a used scissor lift after they were injured when the lift collapsed at a jobsite. (*Id.* at p. 1109.) A jury returned a special verdict in favor of the plaintiffs, finding in part that one of the seller's employees made intentionally false representations about the lift's maintenance. (*Id.* at pp. 1109-1110.) Although the jury allocated only 10 percent of the fault to that employee, the trial court refused to apportion the damages under section 1431.2, ruling the statute was inapplicable to the plaintiffs' fraud cause of action. (*Id.* at p. 1110.)

In affirming the ruling, the *Thomas* court observed that, "[a]t the time Proposition 51 was adopted, the law was well established that a tortfeasor who intentionally injured another was not entitled to contribution from any other tortfeasors." (*Thomas, supra,* 139 Cal.App.4th at p. 1111, citing Code Civ. Proc., § 875, subd. (d).) Further, citing two past cases where "policy considerations of deterrence and punishment" had been invoked to bar reduction of an intentional tortfeasor's liability to reflect another's contributory negligence, the court reasoned the same considerations counseled against construing section 1431.2 to allow an intentional actor to " 'rely on someone else's negligence to shift responsibility for his or her own conduct.' " (*Thomas*, at pp. 1112-1113, citing *Weidenfeller v. Star & Garter* (1991) 1 Cal.App.4th 1 (*Weidenfeller*) and *Heiner v. Kmart Corp.*

46

(2000) 84 Cal.App.4th 335 (*Heiner*).)[10]  Based on these extrinsic aids, the *Thomas* court concluded, "Proposition 51 did not alter

[10]     Even if the unambiguous text of section 1431.2 were in need of construction, neither *Weidenfeller* nor *Heiner* supplies guidance on whether a *defendant* found liable for an intentional tort should be held responsible for *noneconomic* damages attributable to the fault of another.  In *Weidenfeller*, the jury assigned fault for the plaintiff's injuries from an assault in a bar parking lot 75 percent to a third party assailant, 20 percent to the bar, and five percent to the plaintiff.  (*Weidenfeller, supra,* 1 Cal.App.4th at p. 4.)  The plaintiff challenged the apportionment on the ground that the assailant acted intentionally, arguing the clause, "based on principles of comparative fault" in section 1431.2, subdivision (a), restricted the statute's application to cases that did not implicate intentional misconduct.  (*Id.* at p. 5.)  The court rejected the contention that comparative fault cannot apply where intentional torts are involved (*id.* at p. 7), and concluded section 1431.2 limited the bar's liability to 20 percent of the damages.  (*Weidenfeller,* at p. 6; see also *Martin By and Through Martin v. United States* (9th Cir. 1993) 984 F.2d 1033, 1039 [agreeing with *Weidenfeller*, recognizing section 1431.2 "literally applies to any personal injury action," and the "clause 'based upon principles of comparative fault,' instructs how 'the liability of each defendant' is to be determined"].)  However, because the assailant was not named as a defendant, the *Weidenfeller* court had no occasion to address whether a *defendant* found liable for an intentional tort is entitled to apportionment under section 1431.2.

In *Heiner*, after ruling the defendant waived its claim for apportionment of damages, the court nonetheless commented that, "[i]n any event, it is reasonably clear that apportionment of fault for injuries inflicted in the course of an intentional tort-- such as the battery in this case--would have been improper." (*Heiner, supra,* 84 Cal.App.4th at pp. 348-349.)  However, the

the existing principles governing an intentional tortfeasor's liability to an injured plaintiff." (*Thomas,* at p. 1111.)

The *Thomas* court's holding conflicts with our Supreme Court's interpretation of section 1431.2 in *DaFonte.* As *DaFonte* teaches, "section 1431.2 itself contains *no ambiguity* which would permit resort to . . . extrinsic constructional aids." (*DaFonte, supra,* 2 Cal.4th at p. 602, italics added.) Yet, in spite of the statute's plain declaration that "*[e]ach defendant*" shall be liable "only" for those "non-economic" damages directly attributable to his or her own "percentage of fault" (§ 1431.2, subd. (a), italics added; *DaFonte,* at p. 601), *Thomas* invokes extrinsic "principles governing an intentional tortfeasor's liability" to read a limitation into section 1431.2 that is not present in the statutory text. (*Thomas, supra,* 139 Cal.App.4th at p. 1111.) Just as *DaFonte* found section 1431.2 "neither states nor implies an exception for damages attributable to the fault of persons who are immune from liability" (*DaFonte,* at p. 601), we likewise find the statute neither states nor implies an exception for damages attributable to the fault of a person who acted intentionally rather than negligently.

---

verdict form in *Heiner* did not distinguish between economic and noneconomic damages, and the court did not consider the applicability of section 1431.2. (*Heiner,* at p. 343.) Moreover, the *Heiner* court relied exclusively upon comparative fault cases that predated the voters' passage of Proposition 51 in 1986. (See *Heiner,* at p. 349, citing *Li v. Yellow Cab Company of California* (1975) 13 Cal.3d 804; *American Motorcycle Ass'n v. Superior Court* (1978) 20 Cal.3d 578; *Allen v. Sundean* (1982) 137 Cal.App.3d 216; *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154.) The *Heiner* court's dictum is not persuasive on a point that neither it, nor the authorities it relied upon, addressed.

The *Thomas* court's reliance on a different statute governing the *right of contribution* makes the conflict with *DaFonte* especially stark. (See *Thomas, supra,* 139 Cal.App.4th at p. 1111, citing Code Civ. Proc., § 875, subd (d).) A right of contribution obtains only where a "judgment has been rendered *jointly* against two or more defendants." (Code Civ. Proc., § 875, subd. (a), italics added.) As such, the right has no relevance to a proper construction of section 1431.2, which, as *DaFonte* makes clear, "plainly attacks the issue of *joint liability* for noneconomic tort damages *root and branch.*" (*DaFonte, supra,* 2 Cal.4th at p. 602, italics added.)[11]

The *Thomas* court's reliance on "policy considerations of deterrence and punishment" (*Thomas, supra,* 139 Cal.App.4th at p. 1112) is similarly problematic. Section 1431.1 expressly codifies the purpose of the statutes enacted by Proposition 51 (*DaFonte, supra,* 2 Cal.4th at p. 599), and it expresses no concern for advancing or preserving liability principles related to deterrence or punishment. Rather, section 1431.1 decries the unfairness and cost of "[t]he legal doctrine of joint and several liability" that "has resulted in a system of inequity and injustice" (§ 1431.1, subd. (a)), often holding defendants "financially liable for all the damage" even where they are found to share just "a fraction of the fault." (§ 1431.1, subd. (b).) To remedy these inequities, section 1431.1 declares that "defendants in tort

---

[11]　In any event, Code of Civil Procedure section 875, subdivision (d) demonstrates that when the Legislature intends to preclude intentional tortfeasors from availing themselves of a statutory right, it does so explicitly. (Code Civ. Proc., § 875, subd. (d) ["There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person."].)

49

actions shall be held financially liable in closer proportion to their degree of fault." (§ 1431.1, subd. (c).) And, to carry this purpose into effect, Proposition 51 added section 1431.2, which mandates that "[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault." (§ 1431.2, subd. (a); *DaFonte,* at pp. 599-600.)

Consistent with *DaFonte*, we conclude the unambiguous reference to "[e]ach defendant" in section 1431.2, subdivision (a) mandates allocation of noneconomic damages in direct proportion to a defendant's percentage of fault, regardless of whether the defendant's misconduct is found to be intentional. Applying the plain meaning of the statutory text will effectuate its purpose to prevent unfairness by holding all "defendants in tort actions . . . financially liable in closer proportion to their degree of fault." (§ 1431.1, subd. (c).) Because Deputy Aviles's liability is governed by section 1431.2, the judgment must be vacated and separate judgments must be rendered against Deputy Beserra and Deputy Aviles in direct proportion to each defendant's percentage of fault. (§ 1431.2, subd. (a).)

5.    *Plaintiffs' Cross-Appeal*

Plaintiffs cross-appealed from the trial court's order granting Defendants summary adjudication on claims brought under section 52.1, commonly referred to as the "Tom Bane Civil Rights Act" or the "Bane Act." Plaintiff T.E. also cross-appealed from the court's ruling denying her motion for attorney fees under Code of Civil Procedure section 1021.5. Because the evidence presented in connection with the summary adjudication motion was sufficient to raise a triable issue of fact as to whether the deputies deliberately subjected Burley to excessive force, with

50

the specific intent to violate his Fourth Amendment rights, we conclude the court erred in granting summary adjudication against Plaintiffs' Bane Act claims.  We find no error in the court's ruling denying the motion for attorney fees.

a.    *Defendants were not entitled to summary adjudication on Plaintiffs' Bane Act claims*

The Bane Act provides a civil cause of action against anyone who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment . . . of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state."  (§ 52.1, subds. (a) & (b).)  "Although initially enacted 'to stem a tide of hate crimes' [citation], 'a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion.' " (*Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113, 1125 (*Simmons*).)  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 883 (*Austin B.*).)

Defendants moved for summary adjudication of Plaintiffs' Bane Act claims on the ground that, under *Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 959 (*Shoyoye*), a plaintiff must show a "threat, intimidation, or coercion" *independent* of the coercion inherent in an underlying civil rights violation.  Because it was undisputed that Defendants had probable cause to arrest

Burley, they argued evidence showing they used excessive force in effecting the arrest was insufficient to establish a Bane Act violation. The trial court agreed. Granting summary adjudication of the Bane Act claims, the court ruled that "the alleged coercion is . . . inherent in the constitutional violation alleged, the use of excessive force. The statutory requirement of 'threats, intimidation, or coercion' is not met."

In their cross-appeal, Plaintiffs argue the trial court fundamentally misread *Shoyoye*. They contend *Shoyoye*'s independent coercion requirement applies only where the civil rights violation is the result of unintentional or negligent conduct. But where the civil rights violation is *intentional*, Plaintiffs argue the statutory requirements of the the Bane Act are met, even if coercion is inherent in the underlying violation. We agree with Plaintiffs that a more narrow reading of *Shoyoye* is necessary to conform its holding to the statutory text.[12]

In *Shoyoye*, the court considered whether negligent but inherently coercive conduct was sufficient to establish a Bane Act violation. There, the plaintiff sued a county after he was lawfully

---

[12] " 'We review questions of law as well as orders granting summary adjudication under the de novo standard of review.' [Citation.] Likewise, the interpretation of a statute presents a legal question we review independently." (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 504.) "A defendant meets his or her burden in a summary adjudication motion 'by negating an essential element of the plaintiff's case, or by establishing a complete defense, or by demonstrating the absence of evidence to support the plaintiff's case.' " (*Ibid.*) If the defendant does not meet its initial burden, the court must deny the summary adjudication motion. (*Simmons, supra,* 7 Cal.App.5th at p. 1124.)

52

arrested but inadvertently overdetained by 16 days due to a paperwork error. (*Shoyoye, supra,* 203 Cal.App.4th at pp. 951-953.) Citing "multiple references to violence or threats of violence" in other subdivisions of section 52.1, the *Shoyoye* court concluded the statute "was intended to address only egregious interferences with constitutional rights, not just any tort," and the "act of interference with a constitutional right must *itself be deliberate or spiteful*" to establish a Bane Act violation. (*Shoyoye,* at p. 959, italics added.) Further, the court held intentional conduct was required even when the interference was accomplished through necessarily coercive means. Thus, the *Shoyoye* court explained, "where coercion is inherent in the constitutional violation alleged, i.e., an overdetention in County jail, the statutory requirement of 'threats, intimidation, or coercion' is not met. The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself." (*Ibid.*)

Defendants and the trial court read this latter holding to require a showing of coercion independent from the coercion inherent in an underlying civil rights violation, even where the defendant acts *deliberately or spitefully* in interfering with an individual's civil rights. While we acknowledge there is language in *Shoyoye* to support this view, we find this reading to be inconsistent with the court's actual analysis of the issue. More importantly, this reading conflicts with the Bane Act's statutory text. Accordingly, we reject it.

Although the *Shoyoye* court seemed to suggest a categorical rule requiring independent coercion *whenever* coercion is inherent in the underlying civil rights violation, the court's analysis of the statutory text indicates it meant the rule to apply

only where the underlying violation (and the incidental coercion that accompanied it) was the product of *unintentional or negligent* error. Thus, after cataloguing the numerous subdivisions of section 52.1 that referred to "violence or threats of violence," the *Shoyoye* court observed, "[t]he apparent purpose of the statute is not to provide relief for an overdetention brought about by human error *rather than intentional conduct*." (*Shoyoye, supra,* 203 Cal.App.4th at pp. 958-959, italics added.) Put differently, the court recognized that the Bane Act's "apparent purpose" was to provide relief for an overdetention brought about by *intentional* conduct and this, standing alone, would be sufficient to establish a violation. (But see *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 69 (*Allen*) [holding allegation of "a wrongful arrest or detention, without more, does not" state a claim for violation of the Bane Act].)[13]

---

[13] The *Allen* court relied principally upon a Massachusetts case, *Longval v. Commissioner of Correction* (1989) 535 N.E.2d 588 (*Longval*), to conclude a wrongful detention, without more, does not constitute a *coercive* interference with the right to be free from unreasonable seizure. (*Allen, supra,* 234 Cal.App.4th at pp. 68-69.) In *Longval*, the Massachusetts Supreme Judicial Court considered a prisoner's claim under the Massachusetts civil rights law (upon which the Bane Act was modeled) that his rights were violated when he was unlawfully transferred to an administrative segregation unit in another prison without a hearing. (*Longval,* at p. 590.) The *Longval* court held that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act," explaining, "[c]onduct, even unlawful conduct . . . lacks these qualities when all it does is take someone's rights away directly." (*Id.* at p. 593.)

54

The *Shoyoye* court's discussion of why the plaintiff in that case failed to prove "independent" coercion lends additional support to our more narrow reading of the court's holding. In explaining why the incidental coercion the plaintiff suffered did not establish a Bane Act violation, the court continually returned to the distinction between *intentional* interference with civil rights and the negligent interference the plaintiff experienced: "Any intimidation or coercion that occurred was simply that which is reasonable and incident to maintaining a jail. The coercion was not carried out *in order to effect a knowing interference* with [the plaintiff's] constitutional rights. . . . [¶] . . .

Our Supreme Court has warned against using nontextual sources, such as cases interpreting the Massachusetts statute, to reach a construction of the Bane Act that is not supported by its text. (See *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 335, 337 [rejecting "plaintiffs' assertion that because . . . the Massachusetts Civil Rights Act of 1979 [citation] provided the model for . . . portions of section 52.1 . . . and Massachusetts courts have construed the commonwealth's law to apply against private actors' putative 'violations' of legal guaranties that only limit the state's power, we should so construe section 52.1"; explaining, "[s]ection 52.1's language simply does not support that construction"]; see also *Cornell v. City and County of San Francisco* (2017) 17 Cal.App.5th 766, 801 (*Cornell*) [in interpreting California's Bane Act, "we are not obliged to follow the construction the Supreme Judicial Court of Massachusetts placed on the [Massachusetts Civil Rights Act] in what appears to be some brief, fugitive dicta at the end of the opinion in [*Longval*]"].) Because the Bane Act's text plainly prohibits deliberate interference with an individual's civil rights by threat, intimidation, or coercion, we disagree with *Allen* and *Shoyoye* to the extent they hold an *intentional* unlawful arrest is insufficient to establish a Bane Act violation.

55

There is no evidence that [the plaintiff] was treated differently than other inmates who were lawfully incarcerated, or that any conduct directed at him was *for the purpose of interfering* with his constitutional rights." (*Shoyoye, supra,* 203 Cal.App.4th at p. 961, italics added.) Again, the *Shoyoye* court's analysis suggests, if the plaintiff had been *intentionally* overdetained with the *knowing purpose* of interfering with his right to be free from unreasonable seizure, a Bane Act violation would have been established, even though coercion is inherent in every detention, whether lawful or unlawful. In sum, we read *Shoyoye* to hold that where an individual is subject to coercion that is incidental to an *unintentional or negligent* interference with civil rights, the individual must show some additional coercion, independent of that caused by the negligent interference, to establish a Bane Act violation.

This reading of *Shoyoye* is compelled by the statutory text. As discussed, section 52.1, subdivision (a) unambiguously prohibits "a person or persons, whether or not acting under color of law," from "interfer[ing] by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Nothing in the statutory text exempts conduct that is inherently coercive from this prohibition. (See *Austin B., supra,* 149 Cal.App.4th at p. 883 ["The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law."].) While we agree with the *Shoyoye* court that the statutory text requires a *knowing* interference with civil rights by

56

*intentional* threats, intimidation, or coercion, any other limitation that might be derived from the nature of the interference—e.g., an interference that is inherently coercive—has no basis in the statute's unambiguous language, and thus can be imposed only by legislative action. (See *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 842-843 [holding "unambiguous language of section 52.1" referring to " '[a]ny individual' " could not be interpreted "to restrict the benefits of the section to persons who are actual or perceived members of a protected class"; observing, "imposing added limitations on the scope of section 52.1 would appear to be more a legislative concern than a judicial one"].)

The court in *Cornell* reached largely the same conclusion regarding *Shoyoye* and the statutory text. The Bane Act claim in *Cornell* arose from a wrongful arrest. On appeal, the defendants, relying on *Shoyoye*, argued the evidence was insufficient to establish liability because the plaintiff failed to show a separately coercive act apart from the arrest itself. (*Cornell, supra,* 17 Cal.App.5th at p. 795.) In rejecting the argument, the *Cornell* court "acknowledge[d] that some courts ha[d] read *Shoyoye* as having announced 'independen[ce] from [inherent coercion]' as a requisite element of all [Bane Act] claims," but concluded "those courts misread the statute." (*Cornell*, at p. 799.) The court explained:

> "By its plain terms, [the Bane Act] proscribes any 'interfere[nce] with' or attempted 'interfere[nce] with' protected rights carried out 'by threat, intimidation or coercion.' Nothing in the text of the statute requires that the offending 'threat, intimidation or coercion' be 'independent' from the constitutional violation

57

alleged.  Indeed, if the words of the statute are given their plain meaning, the required 'threat, intimidation or coercion' can never be 'independent' from the underlying violation or attempted violation of rights, because this element of fear-inducing conduct is simply the means of accomplishing the offending deed (the 'interfere[nce]' or 'attempted . . . interfere[nce]'). That is clear from the structure of the statute, which reads, 'If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion,' a private action for redress is available."  (*Id.* at pp. 779-800, italics omitted.)

While it declined to adopt *Shoyoye*'s "independent from inherent coercion test," the *Cornell* court agreed that the Bane Act required " 'more egregious conduct than mere negligence' " to impose liability.  (*Cornell, supra,* 17 Cal.App.5th at pp. 796-797.)  In that regard, the court reasoned that "the statutory phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief."  (*Id.* at p. 800.)  However, the *Cornell* court saw "no reason that, in addition, the required 'threat, intimidation or coercion,' whatever form it may take, must also be transactionally 'independent' " from a properly proved civil rights violation.  (*Ibid.*, italics omitted.)

The *Cornell* court suggested the "better approach" was to "focus directly on the level of scienter required to support a Section 52.1 claim."  (*Cornell, supra,* 17 Cal.App.5th at p. 799.)

58

Thus, the court held that, where a civil rights violation has been "properly pleaded and proved, the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the [defendant] had a *specific intent to violate the [plaintiff's civil rights]*, not by whether the evidence shows something beyond the coercion 'inherent' in the [violation]." (*Cornell*, at pp. 801-802, italics added.)

The Ninth Circuit recently adopted *Cornell*'s specific intent standard in an excessive force case brought under the Bane Act. (*Reese v. County of Sacramento* (9th Cir. 2018) 888 F.3d 1030, 1043 (*Reese*).) In concluding there was "no 'convincing evidence that the [California] supreme court likely would not follow' *Cornell*," the appeals court observed, "*Cornell* correctly notes that the plain language of Section 52.1 gives no indication that the 'threat, intimidation, or coercion' must be independent from the constitutional violation." (*Reese*, at p. 1043.) Conversely, "the specific intent requirement articulated in *Cornell* is consistent with the language of Section 52.1, which requires interference with rights by 'threat, intimidation or coercion,' words which connote an element of intent." (*Reese*, at p. 1044.)

Like *Cornell* and *Reese*, we conclude that, to establish liability under the Bane Act, a plaintiff must prove the defendant acted with a specific intent to violate the plaintiff's civil rights. (See also *Simmons, supra,* 7 Cal.App.5th at p. 1127.)[14] Here,

---

[14] The court in *Simmons* reached a similar conclusion regarding a deliberate and inherently coercive interference with a criminal suspect's Fourth Amendment rights. In *Simmons*, the plaintiff presented evidence that, after he was lawfully detained, the two arresting officers punched him several times when he posed no danger, pulled his underwear into a " 'wedgie,' " and

59

Plaintiffs presented sufficient evidence in opposition to Defendants' summary adjudication motion to raise a triable issue of fact on the question of Defendants' intent.

"The Fourth Amendment's prohibition on 'unreasonable . . . seizures' protects individuals from excessive force in the context of an arrest or seizure." (*Fetters v. County of Los Angeles* (2016) 243 Cal.App.4th 825, 837; U.S. Const., 4th Amend.; see *Graham v. Connor* (1989) 490 U.S. 386, 394.)  Although Defendants' evidence established as an undisputed fact that they had probable cause to detain Burley, Plaintiffs' evidence suggested Defendants *deliberately* subjected Burley to excessive force beyond that which was necessary to make the arrest.  Once

---

subjected him to a roadside anal cavity search on suspicion that he possessed drugs.  (*Simmons, supra,* 7 Cal.App.5th at pp. 1120-1121.)  In reviving the plaintiff's Bane Act claim after the trial court granted summary judgment, the *Simmons* court ruled that, "[e]ven assuming the officers had probable cause to arrest [the plaintiff], the complained-of conduct asserted here—multiple nonconsensual, roadside, physical body cavity searches—is necessarily intentional conduct that is separate and independent from a lawful arrest for being in a park after it closed, for riding a bicycle in the dark without a headlight, or for resisting a peace officer." (*Id.* at p. 1127, italics omitted.)  Although *Simmons* adopted the *Shoyoye* court's "separate and independent" framing, the only underlying civil rights violation was the unreasonable search (the precipitating arrest having been indisputably lawful).  Nonetheless, despite the fact that "coercion is inherent" in an unreasonable custodial search (*Shoyoye, supra,* 203 Cal.App.4th at p. 959), the *Simmons* court did not require evidence of coercion independent of the civil rights violation, as the complained-of conduct was "necessarily intentional." (*Simmons,* at p. 1127, italics omitted.)

60

Defendants' use of force crossed that threshold, their conduct became a coercive interference with Burley's civil rights as proscribed by the Bane Act.  Because Plaintiffs presented sufficient evidence to create a triable issue as to whether Defendants subjected Burley to excessive force with the specific intent to interfere with his Fourth Amendment rights, the trial court erred in granting summary adjudication of Plaintiffs' Bane Act claims.

        b.     *The trial court properly denied attorney fees under Code of Civil Procedure section 1021.5*

Code of Civil Procedure section 1021.5 authorizes an award of attorney fees "to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."  The "fundamental purpose" of the statute is to " 'provide some incentive for the plaintiff who acts as a true private attorney general, prosecuting a lawsuit that enforces an important public right and confers a significant benefit, despite the fact that his or her own financial stake in the outcome would not by itself constitute an adequate incentive to litigate.' " (*Nelson, supra,* 113 Cal.App.4th at p. 795.)  In denying Plaintiffs' motion for attorney fees, the trial court found these requisite elements were not met. [15]  We review the court's ruling for an

---

[15]     For simplicity's sake, we refer to the court's denial of "Plaintiffs' attorney fee motion"; however, as Defendants point

61

abuse of discretion, and find no abuse on this record. (*Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1044 [whether a claimant is entitled to Code of Civil Procedure section 1021.5 attorney fees "rests within the sound discretion of the trial court and that discretion shall not be disturbed on appeal absent a clear abuse"].)

"An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' " (*County of Inyo v. City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 (*County of Inyo*), quoting *Serrano v. Priest* (1977) 20 Cal.3d 25, 45, 46, fn. 18.) "The successful litigant's reasonably expected financial benefits are determined by discounting the monetary value of the benefits that the successful litigant reasonably expected at the time the vital litigation decisions were made by the probability of success at that time." (*Collins v. City of Los Angeles* (2012) 205

_____

out and Plaintiffs admit, our jurisdiction to review the order is limited to the ruling against T.E.—the only plaintiff to identify the order denying attorney fees in her notice of cross-appeal. (See *Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 436 ["Our jurisdiction on appeal is limited in scope to the notice of appeal and the judgment or order appealed from."]; *Soldate v. Fidelity National Financial, Inc.* (1998) 62 Cal.App.4th 1069, 1073; *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 47 [" 'Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment [or order] being appealed.' "].)

Cal.App.4th 140, 154; *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215 (*Whitley*).)

" ' "After approximating the estimated value of the case at the time the vital litigation decisions were being made, the court must then turn to the costs of the litigation—the legal fees, deposition costs, expert witness fees, etc., which may have been required to bring the case to fruition. . . . [¶] The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case. . . . [A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.' " (*Whitley, supra,* 50 Cal.4th at pp. 1215-1216.)

In their motion for attorney fees, Plaintiffs claimed their attorneys decided to pursue the case at a time when "the reasonable estimated value of the case was negative." They maintained "the earliest concrete information" they had was the coroner's report, which showed Burley had cocaine, PCP, and marijuana in his system and that "his death was due in part to his behavior while on those drugs." They argued it was "more likely than not that plaintiffs would lose the case on liability, and sums expended for hard costs along with the case."

Defendants responded with evidence showing Plaintiffs' investigator had met with their key eyewitness, Carl Boyer, within a month of Burley's death. At trial, Boyer testified he told the investigator that one deputy had put Burley in a chokehold and another beat him on the head with a flashlight seven to ten times. Defendants also emphasized that all the evidence Plaintiffs presented to the jury on wrongful death damages—

evidence about Burley's relationship with his children and his wife—was readily available to Plaintiffs' counsel at the time the suit was filed.  And, as for Plaintiffs' expected recovery, Defendants cited statements made by Plaintiffs' counsel during voir dire and closing arguments, asking the jury to award between $16.75 and $24 million in total damages.  (See *Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72, 78-79 (*Satrap*) [estimating plaintiffs' expected recovery based on closing arguments to the jury].)

Based on the foregoing evidence, the trial court could reasonably infer that, at the time important litigation decisions were made, Plaintiffs' expected recovery was more than enough to warrant incurring the costs of litigation.  As Defendants showed in their opposition brief, even if discounted for a 30 percent chance of success, Plaintiffs could have anticipated a recovery ranging from more than $5 million to $7.2 million.  These estimates, when discounted for uncertainty, still far exceeded the approximately $1.9 million in attorney fees that Plaintiffs requested.  (See *Satrap, supra,* 42 Cal.App.4th at pp. 76-80 [concluding $1.2 million in attorneys' fees was not disproportionate to an expected recovery of $3 million, even though actual recovery was only $523,750].)  The trial court did not abuse its discretion in determining Plaintiffs failed to show the cost of their legal victory was out of proportion to their individual stake in the matter.  (*County of Inyo, supra,* 78 Cal.App.3d at p. 89; *Nelson, supra,* 113 Cal.App.4th at pp. 795-796 [in wrongful death suit against sheriff's deputies, where jury found decedent died from positional asphyxia caused by deputies' negligence, plaintiffs' request for $5 million and jury's award of

$2 million demonstrated plaintiffs had "substantial" financial incentive to pursue case].)

## DISPOSITION

The judgment is reversed with respect to the noneconomic damages award against Deputy Aviles, and affirmed in all other respects.  On remand, the trial court is directed to vacate the judgment and enter separate judgments against Deputy Aviles and Deputy Beserra allocating noneconomic damages to each defendant in direct proportion to that defendant's percentage of fault.  (Civ. Code, § 1431.2, subd. (a).)

The order granting summary adjudication to Defendants on Plaintiffs' Civil Code section 51.2 claims is reversed, and the matter is remanded to the trial court for further proceedings consistent with the principles expressed in this opinion.  The order denying Plaintiffs' motion for attorney fees under Code of Civil Procedure section 1021.5 is affirmed.

The parties shall bear their own costs.

**CERTIFIED FOR PARTIAL PUBLICATION**


EGERTON, J.

We concur:


EDMON, P. J.


DHANIDINA, J. †

---

†     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

66